No. 15-50186

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

AUSTIN APARTMENT ASSOCIATION,
*Plaintiff/Appellant*
v.
CITY OF AUSTIN,
*Defendant/Appellee*

DORIS LANDRUM, DIMPLE SMITH, GLORIA MIDDLETON, AND
LATORIE DUNCAN,
*Intervenors/Appellees*

On Appeal from the United States District Court
For the Western District of Texas
Civil Action No. 1:14-CV-01146-SS
Honorable Sam Sparks, District Judge, Presiding

INTERVENORS' RESPONSE TO AUSTIN APARTMENT ASSOCIATION'S
EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

Fred Fuchs
Nelson H. Mock
Robert Doggett
TEXAS RIOGRANDE LEGAL AID
4920 North IH-35
Austin, Texas 78751
Phone:   (512) 374-2720
Telefax: (512) 447-3940

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**1.     Plaintiff/Appellant:**

Austin Apartment Association

**2.     Counsel for Plaintiff/Appellant:**

Craig T. Enoch
Melissa A. Lorber
Shelby L. O'Brien
Enoch & Kever PLLC
600 Congress Avenue
Suite 2800
Austin, Texas 78701

**3.     Defendant/Appellee:**

City of Austin

**4.     Counsel for Defendant/Appellee:**

Meitra Farhadi
Patricia L. Link
Assistant City Attorneys
City of Austin Law Department
P.O. Box 1546
Austin, Texas 78767-1546

i

**5.**     **Intervenors/Appellees:**

Doris Landrum
Dimple Smith
Gloria Middleton
Latorie Duncan

**6.**     **Counsel for Intervenors/Appellees:**

Fred Fuchs
Nelson H. Mock
Kelli Howard
Robert Doggett
Texas RioGrande Legal Aid
4920 North IH-35
Austin, Texas 78751

 */s/ Fred Fuchs*
Fred Fuchs
Attorney for Intervenors/Appellees

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ..........................................................i

TABLE OF CONTENTS...........................................................................iii

ARGUMENT ........................................................................................1

    I.      Introduction and Background ..............................................................1

    II.    Standard for granting injunctive relief pending appeal. ....................5

    III.   The Association is not entitled to injunctive relief because it does not have a likelihood of prevailing on the merits......................6

         A.    The trial court correctly held that the City ordinance prohibiting landlords from discriminating against persons who have Section 8 vouchers is not preempted by Texas law. (Op. at **4-6). .....................................................6

         B.    The trial court correctly held that the City ordinance prohibiting landlords from discriminating against persons who have Section 8 vouchers is not preempted by federal law.  (Op. at **7-9)................................................12

         C.    The trial court correctly held that the City ordinance prohibiting landlords from discriminating against persons who have Section 8 vouchers does not constitute a violation of the Texas Constitutional prohibition on impairment of contracts. (Op. at **9-12). ..............................16

    IV.   The Association has not established that its landlord members will suffer irreparable harm without injunctive relief. .....................17

    V.    The public interest favors denial of an injunction pending appeal. ..............................................................................19

REQUEST FOR RELIEF ......................................................................20

CERTIFICATE OF SERVICE ...............................................................22

APPENDIX ........................................................................................23

**<u>ARGUMENT</u>**

## I.  Introduction and Background

The trial court correctly denied the Austin Apartment Association's motion for a preliminary injunction in its "facial" challenge to the City's source of income ordinance pending appeal.  *See Austin Apartment Ass'n v. City of Austin*, No. A-14-CA-1146-SS, 2015 WL 918504 (W.D. Tex. Feb. 27, 2015) (trial court opinion) (hereafter cited as "Op.") (attached as Appendix 1).  The Fair Housing ordinance at the crux of this lawsuit prohibits landlords with three or more dwelling units from discriminating in leasing based on a person's source of income, including housing vouchers.  It is known as the "Source of Income" ordinance and reads in pertinent part as follows:

> SOURCE OF INCOME means lawful, regular, and verifiable income, including, but not limited to, housing vouchers and other subsidies provided by government or non-governmental entities, child support, or spousal maintenance, but does not include future gifts.

*See* City of Austin's Response to Emergency Motion for Injunction Pending Appeal, Appendix, Tab 2 (copy of ordinance).  With the inclusion of source of income as a protected class, Austin joined dozens of states and local jurisdictions that have enacted similar ordinances. *See* Op., at *12.  At least twelve states, the District of Columbia, and thirty-six cities or municipalities have adopted varying

forms of source of income laws.[1]  Moreover, four state appellate courts and one federal district court have rejected landlord federal preemption challenges to laws or ordinances prohibiting landlords from refusing to lease to individuals with Section 8 vouchers.  *See* Op. at *7 (citing cases).

The ordinance merely prohibits a landlord from refusing to lease to a prospective tenant on the sole basis that the person has a Section 8 housing voucher.  The Section 8 Housing Choice Voucher Program[2]  does not require a landlord to lease to a person with a voucher who does not meet the landlord's screening criteria.  *See* 24 C.F.R. § 982.307(a)(2) (2014).  It does not require a landlord to accept a reduced rent.  *See generally id.* at § 982.305(a)(4), (5); § 982.503; § 982.505.  It does not require a landlord to accept a lesser security deposit.  *See id.* at § 982.313(a).  It does not require a landlord to use a different lease (although a Section 8 tenancy addendum is incorporated into the landlord's standard lease).  *See id.* at § 982.308(b) (2).  It does not limit the landlord's right to terminate the lease at the end of the initial lease term.  *See id.* at § 982.310(a); § 982.310(d). It does not require a landlord to hold a unit off the market if a person

---

[1]  Poverty & Race Research Action Council, *Expanding Choice: Practical Strategies for Building a Successful Housing Mobility Program, Appendix B: State, Local, and Federal Laws Barring Source-of-Income Discrimination* (May 2014).

[2]  The Section 8 Housing Choice Voucher Program statute is set forth at 42 U.S.C.A. § 1437f(o) (West 2012 & Supp. 2014).  The regulations are set forth at 24 C.F.R. Part 982 (2014).

without a voucher is able to sign a lease before a person with a voucher can do so. The Section 8 Program does require that landlords sign a housing assistance payments contract with the local public housing authority. *See id.* at § 982.305(c)(2). However, no landlord is required to sign a contract with the federal government, as alleged by the Association. *See* Emergency Motion, at p. 4.

The Apartment Association's statement that the Section 8 Program is a "complicated administrative labyrinth" completely overstates what participation in the program means for a landlord. *See id.* Participation means only the following: If an individual with a voucher applies and qualifies under the landlord's normal screening criteria, the landlord and the putative tenant will sign a Request for Tenancy Approval form and submit it to the local public housing authority. *See* 24 C.F.R. § 982.302(b), (c), (d). The housing authority must inspect the unit to make sure that it meets basic housing quality standards. *See id.* at § 982.305(b)(2)(i). The housing quality standards are primarily health and safety standards. *See id.* at § 982.401(setting forth the housing quality standards). Indeed, these housing quality standards are no more onerous than those already imposed by the Austin City Code. *See* Op. at *13. If the unit passes inspection, the tenant and the landlord will sign the landlord's standard lease (with the tenancy addendum incorporated). *See* 24 C.F.R. § 982.308(b) (1), (2). The landlord will sign a

3

housing assistance payments contract—which includes the tenancy addendum—with the public housing authority. *Id.* at § 982.305(c).

The relationship between the landlord and the tenant is governed entirely by the lease. *See id.* at § 982.308 (Lease and tenancy). The landlord may manage the property just as any other property. The trial court found that the regulations "place some burden on the landlords subject to them," but concluded that "[i]n the context of a facial due process challenge, "the Court will not substitute its judgment for the City Council's" about the need for the ordinance. Op. at *13. The court properly refused to give to the Apartment Association the legislative relief it was unable to get with the City Council.

The Apartment Association contends that the requirements of the Section 8 Program will impose "substantial legal and administrative compliance costs," and that "the Section 8 requirements and administrative procedures will immediately impose costs, vacancies, and delays, which add risk and uncertainty for property owners and will have a material negative economic impact." *See* Emergency Motion, at pp. 4, 5. As noted, the trial court acknowledged some burden, but rejected the argument in the context of the Association's facial challenge, concluding that "[t]hese burdens are not so severe as to constitute a violation of due process." Op. at *13. Also, the Apartment Association's arguments are mere

4

speculation since the law has not yet been enforced, and their case is not an "as applied" challenge to the law.

Nothing in the ordinance mandates that a landlord hold a unit open for a voucher tenant pending an inspection if an equally qualified non-Section 8 applicant can move into the unit more quickly. Similarly, nothing in the regulations precludes a Section 8 voucher holder from signing a lease with the landlord and assuming full responsibility for the rent until such time that the unit passes inspection by the housing authority.

Intervenors are United States citizens and residents of Austin. Each Intervenor has a Section 8 Housing Choice Voucher and has, over the course of their participation in the Section 8 Program, lived in a number of different apartment complexes. Three of the Intervenors have disabilities, and one is 71 years of age. Each is African American. Each has had to search for housing and has been told by landlords that they refuse to lease to Section 8 voucher holders. Each has been limited in the geographical areas in which they might live because of refusal by most landlords to lease to persons with Section 8 vouchers. As a result, their housing choices have been limited.

## II. Standard for granting injunctive relief pending appeal.

This court entered a per curiam order on March 6, 2015, granting the

injunction pending further order of this Court."[3]  The court should deny the request for an injunction pending appeal because the Apartment Association cannot meet the criteria established by this court for an injunction pending appeal:

> [I]n order to be entitled to a stay pending appeal under Rule 62 F.R.Civ.P. or Rule 8, F.R.AP., a petitioner must show the likelihood of his prevailing on the merits on appeal, that he is likely to suffer irreparable injury from the denial of the stay, that the other parties will not be substantially harmed by the grant of stay, and that granting the stay will serve the public interest.

*Drummond v. Fulton County Department of Family & Children's Serv.*, 532 F.2d 1001 (5th Cir. 1976), *rev'd on other grounds*, 547 F.2d 835 (5th Cir. 1977) (*quoting Beverly v. United States,* 468 F.2d 732, 741 n.13 (5th Cir. 1972)).  Here, the Association has not shown a likelihood of prevailing on the merits, it has provided no evidence of irreparable injury, and the balance of equities weighs in favor of the public interest in application of the Fair Housing source of income ordinance enacted by the City of Austin over the private interests of the Association.

### III.   The Association is not entitled to injunctive relief because it does not have a likelihood of prevailing on the merits.

#### A. The trial court correctly held that the City ordinance prohibiting landlords from discriminating against persons who have Section 8 vouchers is not preempted by Texas law. (Op. at

---

[3] Counsel for Intervenors were out of Austin at a firm-wide meeting on March 5 and March 6 (returning the evening of March 6) and first became aware in the afternoon of March 6 of the Apartment Association's 6:00 p.m. e-mail of March 5 giving notice of the filing of its emergency motion.

**\*\*4-6).**

The trial court properly recognized that home-rule cities, like Austin, "'have broad discretionary powers' to enact their own ordinances" so long as they do not contain any provision inconsistent with the Texas Constitution or any state statute. *See* Op. at \*5 (citing cases). Under Texas law, the judiciary "presume[s] a home-rule city charter provision to be valid, and the courts cannot interfere unless it is unreasonable and arbitrary, amounting to a clear abuse of municipal discretion." *In re Sanchez*, 81 S.W.3d 794, 796 (Tex. 2002) (per curiam). "[I]f the Legislature decides to preempt a subject matter normally within a home-rule city's broad powers, it must do so with "**unmistakable clarity**." *Southern Crushed Concrete, LLC v. City of Houston*, 398 S.W.3d 676, 678 (Tex. 2013) (quoting *In re Sanchez*, 81 S.W.3d 794, 796 (Tex. 2002)) (citations omitted) (emphasis added). "Accordingly, courts will not hold a state law and a city charter provision repugnant to each other if they can reach a reasonable construction leaving both in effect." *In re Sanchez,* 81 S.W.3d at 796.

In light of the "unmistakable clarity" test applied by the Texas courts to Texas preemption challenges, the trial court properly rejected the Apartment Association's argument that Section 214.903 of the Texas Local Government Code preempts Austin's ordinance. The law was enacted in 1993 and reads as follows:

(a) The governing body of a municipality may adopt fair housing ordinances that provide fair housing rights, compliance duties, and remedies that are substantially equivalent to those granted under federal law. Enforcement procedures and remedies in fair housing ordinances may vary from state or federal fair housing law.

(b) Fair housing ordinances that were in existence on January 1, 1991, and are more restrictive than federal fair housing laws remain in effect.

Tex. Local Gov't. Code Ann. § 214.903 (West 2008). In construing the statute, the court "must enforce it 'as written' and 'refrain from rewriting text that lawmakers chose.'" *Jaster v. Comet II Construction, Inc.*, 438 S.W.3d 556, 562 (Tex. 2014) (quoting *Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 443 (Tex. 2009)).

The addition of a protected class is consistent with substantially equivalency in federal law with respect to rights, compliance duties, and remedies. Congress delegated to the United States Department of Housing and Urban Development (HUD) the task of determining substantial equivalency of state and local fair housing statutes and ordinances. *See* 42 U.S.C.A. § 3610(f)(3)(a) (West 2012). Congress also provided that HUD may certify an agency as substantially equivalent only if the substantive rights protected are substantially equivalent. *Id.* at § 3610(f)(3)(a), (i).

In the implementing regulations for the Federal Fair Housing Act, HUD addressed the specific question of substantial equivalency and the creation of

8

additional protected classes by states and local governmental entities:

> If a state or local law is different than the Act in a way that does not diminish coverage of the Act, **including, but not limited to, the protection of additional prohibited bases**, then the state or local law may still be found substantially equivalent.

24 C.F.R. § 115.204(h) (2014) (emphasis added).  Thus, nothing in state or federal law requires that the state or local law be identical with federal law for substantial equivalency to attach.

The first sentence of Section 214.903(a) of the Texas Local Government Code is an affirmative grant to municipalities of the right to adopt fair housing ordinances that are substantially equivalent to those granted under federal law. The trial court reasoned that "the salient 'essential features' of the federal Fair Housing Act are the classes of persons it protects," and "[t]he ordinance, in protecting from discrimination all of the classes protected under federal law and then some, exhibits the essential feature of federal fair housing law."  Op. at *5.

Moreover, HUD, the federal agency entrusted by Congress with the implementation of both the Fair Housing Act and the Section 8 Program, has specifically rejected federal preemption in the implementing regulations for the Section 8 Housing Choice Voucher Program:

> (d) *State and local law*.  **Nothing in part 982 is intended to pre-empt operation of State and local laws that prohibit**

9

> **discrimination against a Section 8 voucher-holder because of status as a Section 8 voucher-holder.**

24 C.F.R. § 982.53(d) (2014) (emphasis added.).  This language is clear.  Local laws prohibiting discrimination against Section 8 voucher holders are not pre-empted by federal law.  As the administering agency for the Section 8 Housing Choice Voucher Program, HUD's regulation is entitled to deference.  *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer. ..").  The language is also indicative that HUD views Fair Housing ordinances prohibiting discrimination against Section 8 voucher holders as substantially equivalent.

The second sentence of Section 214.903(a) of the Texas Local Government Code grants specific authority to a municipality to provide for a variance in enforcement procedure and remedies from state or federal law.  It does nothing more than address enforcement procedures and remedies.  It is an express recognition by the Legislature that a municipality may utilize different enforcement procedures and provide different remedies without destroying the substantial equivalency of the fair housing ordinance under Texas law.

10

Subsection (b) of Section 214.903 allows existing fair housing ordinances in existence on January 1, 1991, that are more restrictive than federal fair housing law, to remain in effect.  The word "restrictive" means "limiting."  Webster's New World College Dictionary 1223 (4th ed. 2001).  Thus, existing ordinances that are more limiting with respect to fair housing rights, compliance duties, and remedies are expressly allowed to remain in effect.  Here, again, the Legislature does not prohibit a city from enacting a more expansive ordinance adding additional classes; it merely affirms that existing ordinances that are more restrictive than federal law remain in effect.

The Apartment Association also contended in the trial court that the source of income class is "significantly different" than the protected classes under federal and state law, because the federal and state classes pertain to one's identity. Plaintiff's Petition [Dcmt. 4], p. 21 at ¶ 23.  Although race, color, sex, and national original pertain to identity, the same is not true of the protected classes on familial status, religion, and disability.  Race, color, sex, and national origin are innate characteristics.  Familial status (families with children under age 18),[4] disability,[5] and religion are not such innate characteristics.  These classes are transitory in nature in that an individual may fall within the protection of the class at a particular

_____

[4] *See* 42 U.S.C.A. § 3602(k) (West 2012) (defining familial status).
[5] *Id.* § 3602(h) (defining "handicap").

time and at other times not be a member of the class. The trial court correctly rejected the Apartment Association's argument that the ordinance is not substantially equivalent. *See* Op. at **5-6.

**B. The trial court correctly held that the City ordinance prohibiting landlords from discriminating against persons who have Section 8 vouchers is not preempted by federal law. (Op. at **7-9).**

Nothing in the language of the Section 8 Housing Choice Voucher statutory provisions precludes states and local governmental entities from enacting laws or ordinances that prohibit landlords from discriminating against Section 8 voucher holders. *See generally* 42 U.S.C.A. § 1437f(o) (West 2012 & Supp. 2014). The Apartment Association states that "[t]he statute provides that a property owner's participation in the program is voluntary." Emergency Motion, at 14. However, the statute nowhere affirmatively states a landlord's participation in the program is voluntary. *See generally* 42 U.S.C.A. § 1437f(o) (West 2012 & Supp. 2014). Similarly, it does not mandate participation. *See id.*

The trial court rightly rejected the argument that the Ordinance "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Op. at *7. First, Congress stated its purpose in creating the Section 8 Housing Program as follows: "For the purpose of aiding low-income families in

12

obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing housing in accordance with the provisions of this section." *See* 42 U.S.C. § 1437f(a) (West 2012).  The trial court correctly recognized that the City's ordinance clearly serves the statutory purposes and objectives. Op. at **7-8.

Second, as earlier noted in this Response, HUD has specifically rejected federal preemption of local and state laws prohibiting discrimination against voucher holders in the implementing regulations for the Section 8 Housing Choice Voucher Program:

> (d) *State and local law*.  **Nothing in part 982 is intended to pre-empt operation of State and local laws that prohibit discrimination against a Section 8 voucher-holder because of status as a Section 8 voucher-holder.**

24 C.F.R. § 982.53(d) (2014) (emphasis added.).  As the administering agency for the Section 8 Housing Choice Voucher Program, HUD's regulation is entitled to deference.  *See Chevron*, 467 U.S. 837, 844 (1984); *Schweiker v. Gray Panthers,* 453 U.S. 34, 44 (1981).

Third, as the trial court states in its opinion, "the Association's argument [on federal preemption] has been rejected by every court which has confronted it. Op. at *7 (citing one federal district court case and four state court cases that directly

13

addressed federal preemption of state or local laws prohibiting discrimination against Section 8 voucher holders).

Fourth, under the Fair Housing Act, Congress specifically preempted the law of any state, or political subdivision "that purports to require or permit any action that would be a discriminatory housing practice under this subchapter." *See* 42 U.S.C. § 3615 (West 2012). Thus, Congress chose only to preempt state or local laws that would be invalid under the Fair Housing Act. *See id.* It did not preempt any more expansive state or local laws on fair housing. Had it intended to do so, it would have done just that.

Neither of the two federal appellate court cases that the Apartment Association cites in support of its argument that federal law preempts Austin's ordinance directly addresses federal preemption. *See* Op. at *8 (discussing and recognizing that the two federal appellate court cases cited by the Apartment Association did not directly address federal preemption and turned on unique facts). In addition, the state court opinions relied upon by the Apartment Association do not directly address federal preemption. *See* Emergency Motion, at pp. 13, 15-16. In *Edwards v. Hopkins Plaza Ltd. Partnership*, 783 N.W.2d 171 (Minn. Ct. App. 2010), the court does not discuss federal preemption. Rather, it addressed an interpretation of Minnesota law and concluded that the law protecting

14

individuals based on their "status with regard to public assistance" did not require

property owners to participate in the Section 8 Program.   *Id.* at 177.   It

distinguished the decision in *Franklin Tower One, L.L.C. v. N.M.,* 725 A.2d 1104,

1111-14 (N.J. 1999) from New Jersey, noting that the Minnesota statute "is

fundamentally different than the statute at issue in *Franklin* because the Minnesota

statute "does not prohibit refusal to rent based on the tenant's lawful source of

income" but protects individuals based on their "status with regard to public

assistance." *Edwards,* 783 N.W.2d at 177.

Similarly, the court in *Dussault v. RRE Coach Lantern Holdings, LLC*, 86

A.3d 52 (Me. 2014) does not discuss federal preemption and has no bearing on the

issues in this case.  That case addressed whether a refusal to include the Section 8

tenancy addendum constituted a violation of a particular state law in Maine

prohibiting discrimination against persons who are recipients of public assistance,

including medical assistance and housing assistance, primarily because of the

individual's status as a recipient.  *See id.* at 58 (text of the statute).  The concurring

opinion and decisive opinion in a 4-3 decision concluded that prior action by the

State Legislature in refusing to enact legislation making it unlawful to decline to

rent properties because of the contractual burdens imposed on owners as a

condition of Section 8 participation mandated the conclusion that a landlord's

15

refusal to include the Section 8 tenancy addendum did not constitute illegal discrimination. *Id.* at 64.

### C. The trial court correctly held that the City ordinance prohibiting landlords from discriminating against persons who have Section 8 vouchers does not constitute a violation of the Texas Constitutional prohibition on impairment of contracts. (Op. at **9-12).

The Apartment Association also argues that the ordinance violates article I, § 16 of the Texas Constitution, which prohibits "any law impairing the obligation of contracts." Emergency Motion, at p. 16. The trial court rejected both the impairment of contracts claim and the freedom of contract arguments. *See* Op. at **9-12. The constitutional prohibition on impairment of contracts applies only where the parties have entered into a contract, and a law is subsequently enacted that unlawfully impairs the existing contract. *See,* Op. at *9 (citing Texas cases). No existing contracts are affected by the City's source of income ordinance. Thus, this claim is wholly lacking in merit.

Similarly, the court properly rejected the Apartment Association's freedom of contract argument. *See* Op. at **10-13. The freedom to contract in Texas is not unlimited. *Fairfield Ins. Co. v. Stephens Martin Paving, LP,* 246 S.W.3d 653, 664 (Tex. 2008). Indeed the Texas Property Code places many limits on a landlord's ability to contract and even dictates some of the contents of the leases. *See e.g.,*

16

Tex. Prop. Code Ann. § 92.006 (West 2014) (limits on contractual rights of landlords and limits on wavier and expansion of duties and remedies); § 92.006(g) (tenant's right to vacate a dwelling and avoid liability under §§ 92.016 and 92.017 may not be waived except as provided in those sections); § 92.008(g) ("A provision of a lease that purports to waive a right or to exempt a party from a liability or duty under this section is void."); § 92.0081(j) ("A provision of a lease that purports to waive a right or to exempt a party from a liability or duty under this section is void."); § 92.015(b) ("A provision in a lease is void if the provision purports to: (1) waive a tenant's right to summon police … or (2) exempt any party from a liability or a duty under this section.").

In addition, the Apartment Association portrayal of the Section 8 Program requirements is misleading and overstates some of the program requirements. *See* Emergency Motion, at pp. 6-8.  The chart set forth in Appendix 2 to this Response is intended to give this Court a truer picture of the differences between a private tenancy with a Texas Apartment Association lease and a tenancy with a Section 8 voucher tenant.

## IV.   The Association has not established that its landlord members will suffer irreparable harm without injunctive relief.

The Association alleges, but has not offered proof, that its members will suffer irreparable harm if they are required "to start contracting with the

17

government and begin leasing to Section 8 residents on one-sided government-mandated lease terms.  Those long-term terms contracts will cause economic harm and cannot readily be undone after the conclusion of the litigation."  Emergency Motion, at p. 18.  This unsupported assertion is belied by the fact that the Section 8 tenant-based assistance program has been in existence since 1974.  *See* Pub. L. 93-383, tit. II, § 201, § 8, 88 Stat. 633, 653 (Aug. 22, 1974) (enacting tenant-based assistance program) (codified at 42 U.S.C.A. § 1437f (West 2012)).  Thus, some variation of the Housing Assistance Payments contract attached as Exhibit B to the Association's Motion has been used and signed by landlords on a nationwide basis for forty years.  The Association's assertion is further belied by the fact that similar laws or ordinances have withstood challenged in four states and the District of Columbia.  Op. at *7.  The contracts are not one-sided, but drafted to ensure that a housing authority does not pay for a slum property or pay on a vacant property.[6]

Moreover, the assertion that the contracts are long-term and will cause economic harm that cannot readily be undone is not based in fact.  As set forth earlier in this Response, the standard lease term under the Section 8 Program is for one year, after which the landlord may terminate the tenancy for no reason.  But

---

[6] For one-sided leases, see the Texas Apartment Association (TAA) lease that landlords require tenants to sign.  *Compare* TAA Lease *with* HAP Contract (attached to Exhibits C and B to Emergency Motion).

the ordinance does not mandate that a landlord use a one-year lease; if a landlord's standard practice is to require a six-month lease, the housing authority will have to accept that or inform the voucher holder that she must go elsewhere to rent. And, the landlord determines the rent amount and the security deposit.

The United States Supreme Court has long recognized that states have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails. *See Pennell v. City of San Jose*, 485 U.S. 1, 9-10, 12 n.6 (1988) (holding that facial challenge to rent control ordinance as violating the prohibition against taking private property without just compensation was premature; reaffirming that states have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails); *see also Marcavage v. Borough of Lansdowne, Pennsylvania,* 826 F. Supp.2d 732 (E.D. Penn. 2011), *aff'd.,* 493 Fed. Appx. 301 (3d. Cir. 2012) (rejecting landlord's facial attack and "as applied" challenge to ordinance requiring landlords to obtain annual rental license).

## V. The public interest favors denial of an injunction pending appeal.

The only interest served by granting an injunction pending appeal is the

19

private interest of those landlords who do not wish to rent to persons with Section 8 vouchers.  On the other hand, as the trial court found, "the Ordinance advances an obviously legitimate government interest: ensuring low-income persons – many of whom are racial minorities, children, disabled, or elderly – have access to affordable housing (and thus to better schools and safer neighborhoods) throughout the City of Austin."  Op. at *11.  This public interest surely outweighs the interest of private landlords who can still apply their usual tenant selection criteria and ask for the same rents and security deposits from tenants with or without vouchers. Thus, an injunction is not proper under either the four-factor test or the alternative test.  *Cf. Wildmon v. Berwick Universal Pictures*, 983 F.2d 21 (5th Cir. 1992) (reversing stay pending appeal; noting that the legal question involved is serious only to the plaintiffs, not the general public, and the balance of equities weighs heavily in favor of lifting the stay).

## **REQUEST FOR RELIEF**

Accordingly, Intervenors request that this Court deny the Apartment Association's motion for an injunction pending appeal.

Respectfully submitted,

TEXAS RIOGRANDE LEGAL AID

4920 North IH-35
Austin, Texas 78751
Telephone: 512-374-2700, ext. 2720
Fax: 512-447-3940
Email: ffuchs@trla.org
Email: nmock@trla.org


By:     /s/ Fred Fuchs
FRED FUCHS
State Bar No. 07498000


     /s/ Nelson H. Mock
NELSON H. MOCK
State Bar No. 24003922


     /s/ Robert W. Doggett
ROBERT W. DOGGETT
State Bar No. 05945650

ATTORNEYS FOR INTERVENORS

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 9th day of March 2015, I electronically filed a true and correct copy of the foregoing Intervenors' Response to Austin Apartment Association's Emergency Motion for Injunction Pending Appeal with the Clerk of Court using the CM/ECF system, which will send notification to counsel of record for all parties:

Craig T. Enoch
cenoch@enochkever.com
Melissa A. Lorber
mlorber@enochkever.com
Shelby L. O'Brien
sobrien@enochkever.com
Enoch & Kever PLLC
600 Congress Avenue
Suite 2800
Austin, Texas 78701

*Attorneys for Plaintiff*

Meitra Farhadi
meitra.farhadi@austintexas.gov
Patricia L. Link
patricia.link@austintexas.gov
Assistant City Attorneys
City of Austin Law Department
P.O. Box 1546
Austin, Texas 787678-1546

*Attorneys for Defendant City of Austin*

        /s/ Robert W. Doggett
        ROBERT W. DOGGETT

No. 15-50186

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

AUSTIN APARTMENT ASSOCIATION,
*Plaintiff/Appellant*

v.

CITY OF AUSTIN,
*Defendant/Appellee*

DORIS LANDRUM, DIMPLE SMITH, GLORIA MIDDLETON, AND
LATORIE DUNCAN,
*Intervenors/Appellees*

---

On Appeal from the United States District Court
For the Western District of Texas
Civil Action No. 1:14-CV-01146-SS
Honorable Sam Sparks, District Judge, Presiding

# **APPENDIX**

1. *Austin Apartment Ass'n v. City of Austin*, No. A-14-CA-1146-SS, 2015 WL 918504 (W.D. Tex. Feb. 27, 2015)

2. Comparison of Texas Apartment Association lease and Section 8 Housing Voucher Program Requirements

# <u>APPENDIX</u>

1. *Austin Apartment Ass'n v. City of Austin*, No. A-14-CA-1146-SS, 2015 WL 918504 (W.D. Tex. Feb. 27, 2015)

2015 WL 918504
Only the Westlaw citation is currently available.
United States District Court,
W.D. Texas,
Austin Division.

AUSTIN APARTMENT
ASSOCIATION, Plaintiff,
v.
CITY OF AUSTIN, Defendant.

No. A–14–CA–1146–SS.
|
Signed Feb. 27, 2015.

**Attorneys and Law Firms**

Craig T. Enoch, Melissa Anne Lorber, Shelby O'Brien, Enoch Kever PLLC, Austin, TX, for Plaintiff.

Meitra Farhadi, Assistant City Attorney, Patricia L. Link, City of Austin Law Department, Austin, TX, for Defendant.

***ORDER***

SPARKS.

**\*1** BE IT REMEMBERED on the 26th day of January 2015, the Court held a hearing in the above-styled cause, and the parties appeared by and through counsel. Before the Court are Plaintiff Austin Apartment Association's Motion for Preliminary Injunction [# 4], Defendant City of Austin's Response [# 8] thereto, Intervenors Doris Landrum, Dimple Smith, Gloria Middleton, and Latorie Duncan's Response [# 7] thereto, Plaintiffs Trial Brief on Legal Authorities and Comparing Ordinance–Mandated and Free–Market Lease Terms [# 11], Defendant's Response [# 15] thereto, and Intervenors' Response [# 14] thereto. Having reviewed the documents, the arguments of the parties at hearing, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

**Background**

On December 11, 2014, the City Council of the City of Austin, Texas, enacted Ordinance Number 20141211–050 (the Ordinance). The Ordinance amends the City's fair housing code to prohibit landlords from refusing to rent to prospective tenants on the basis of "source of income," which is defined to include "housing vouchers and other subsidies provided by government or non-governmental entities."Prelim. Inj. Hrg. Ex. P–8 (the Ordinance) at 2. Consequently, under the Ordinance, where a person is otherwise qualified to rent a property, the landlord may not reject that person's application solely because he or she wishes to pay a portion of the rent with a voucher obtained through the federal Housing Choice Voucher Program (HCVP or the Program), formerly known as Section 8.

Plaintiff Austin Apartment Association (the Association), a trade association whose members control rental properties serving over 192,000 households, claims the Ordinance is invalid and seeks a preliminary injunction against its enforcement pending resolution of this action. Specifically, the Association argues the Ordinance is preempted by Texas and federal law, impairs the obligation of contracts in violation of the Texas Constitution, and constitutes a regulatory taking and due process violation under the Texas and United States Constitutions. As set forth below, the Court finds the Association has failed to demonstrate a substantial likelihood of success on the merits of its claims, and therefore DENIES the motion for preliminary injunction.

**A. The Housing Choice Voucher Program**

Congress created the Housing Choice Voucher Program to "aid[ ] low-income families in obtaining a decent place to live" and to "promot[e] economically mixed housing." 42 U.S.C. § 1437f(a). The Program is funded by the United States Department of Housing and Urban Development (HUD) and administered by state and local public housing authorities (PHAs) in accord with the regulations promulgated by HUD. Families (or individuals) who wish to receive housing vouchers must apply with their local PHA, which is responsible for screening prospective participants for federal eligibility, issuing vouchers, and contracting with landlords who lease to HCVP participants. *See* Prelim. Inj. Hrg. Ex. P–12 (HCVP Guidebook) at 1–12.

**\*2** Once a family is approved by and receives a voucher from the PHA—a process that may take years, as demand for vouchers far outstrips supply and waiting lists are very long—the family is responsible for finding a landlord in the private rental market willing to lease to them. See 24 C.F.R. § 982.302(a). Federal law does not require landlords to accept housing vouchers, and landlords who do accept vouchers are not required to approve tenants merely because they are voucher holders. Rather, landlords who participate in the Program may screen prospective tenants and reject them if screening reveals red flags in terms of paying rent and utility bills, caring for rental housing, respecting neighbors, criminal activity, and the like. See 24 C.F.R. § 982.307(a) (discussing landlord's obligation to screen prospective tenants and factors properly considered in so doing).

Once the family has located a willing landlord and the family and landlord have negotiated the terms of the lease, the PHA must also approve the prospective tenancy. The landlord and family fill out and submit to the PHA a two-page Request for Tenancy Approval, which provides the PHA with basic information such as the address and size of the unit to be rented and the utilities and appliances provided by the landlord versus paid for by the tenant. See Prelim. Inj. Hrg. Ex. P–2 (Request for Tenancy Approval) at 1. The Request for Tenancy Approval also requires landlords who rent more than four units to disclose the rent charged for comparable units, so the PHA can ensure the rent charged to the voucher holder is comparable to that charged to unassisted tenants. Id. at 2.

The portion of the rent paid by the government is pegged to the PHA's schedule of "payment standards," dollar amounts based on the local fair market rent for apartments or houses of a certain size. HCVP Guidebook at 7–1. The PHA will never pay more than its fixed share, equal to the applicable payment standard less the dollar amount for which the voucher holder is responsible. Id. at 6–2. Typically, a family must pay thirty percent of its monthly adjusted income toward rent. Id. at 6–1; see 42 U.S.C. § 1437f(o)(2)(A). If a family wants to rent a unit which costs more than thirty percent of its monthly adjusted income plus the PHA's fixed share, the family may do so and pay the additional cost—but the amount paid by the family may never exceed forty percent of its monthly

adjusted income. 42 U.S.C. § 1437f(o)(3); see HCVP Guidebook at 6–2. If the family's responsibility would exceed forty percent of its monthly adjusted income, the family may not rent that unit. HCVP Guidebook at 6–2.

If the PHA approves the tenancy, an inspection of the house or apartment to be leased to the family is scheduled. The inspection ensures the unit passes basic federal housing quality standards (HQS) geared toward ensuring tenant health and safety; for example, the property must have "a shower or bathtub with hot and cold running water," lockable exterior doors, "a safe heating system," permanently installed electrical outlets, and the like. See Prelim. Inj. Hrg. Ex. P–3 (HQS Checklist) at 5–7. All utilities must be turned on prior to the inspection. Id. at 9. According to the HQS Checklist, some of the most common reasons a unit fails inspection include broken smoke detectors, missing or cracked electrical outlet covers, peeling paint, trip hazards from carpet or other permanent floor coverings, cracked windowpanes, and inoperable stove burners. Id. at 4. If a property fails inspection, the landlord is required to make any needed repairs and notify the PHA when the property is ready for re-inspection.

**\*3** Once the unit has passed inspection, the landlord and the PHA must execute the HUD-prepared Housing Assistance Payments Contract. See Prelim. Inj. Hrg. Ex. P–4 (HAP Contract). Execution of the HAP Contract is required by HUD, and without an executed HAP Contract covering a particular family's tenancy, the PHA will not pay any rent to the landlord. See id. at 4 ("During the HAP contract term, the PHA will pay housing assistance payments to the owner [.]"). The landlord cannot modify or negotiate the HAP Contract; it "must be word-for-word in the form prescribed by HUD." Id. at 1. Further, the landlord must append a Tenancy Addendum to the landlord-tenant lease agreement, which controls in the event the two conflict. Prelim. Inj. Hrg. Ex. P–5 (Tenancy Addendum) at 1 § 1(b).

Under the HAP Contract, the PHA's responsibility to pay rent terminates automatically under a number of circumstances, including if the tenant terminates the lease, moves out of the unit, or is dropped from HCVP, or if the PHA determines there is not

enough funding to continue the Program. *See* HAP Contract at 4 § 4(b)(1)-(6) (detailing situations in which the HAP Contract automatically terminates). The PHA has discretion to terminate payments if the family leasing the property breaks up, "if the PHA determines that the [property] does not provide adequate space ... because of an increase in family size or a change in family composition," or if the landlord violates the HAP Contract. *Id.* at 5 § 4(b)(7)-(9). Additionally, the HAP Contract governs the timing of payment of rent. Although the PHA "must pay housing assistance payments promptly when due," it will only be obligated to pay late fees for tardy payments if (1) charging late fees is general practice in the community, (2) charging late fees is the landlord's general practice, and (3) the landlord also charges the leasing family late fees. *Id.* at 5 § 7(a). Additionally, the PHA is not required to pay late fees, even where those three conditions are met, "if HUD determines that late payment by the PHA is due to factors beyond the PHA's control."*Id.* at 5 § 7(a)(3). Late payment of rent by the PHA is not a violation of the lease, and the landlord cannot terminate a tenancy because the PHA fails to pay its share. *Id.* at 9 § 5(d).

### B. Procedural History

On December 12, 2014, the Association filed suit in the 345th Judicial District Court of Travis County, Texas, seeking a declaration the Ordinance is invalid, a temporary restraining order, and preliminary and permanent injunctive relief. *See* Notice Removal [# 1–3] at 2 (Orig.Pet.). The City removed to this Court on December 31, 2014, invoking federal question jurisdiction. *Id.* [# 1] ¶ 1. Intervenors Latorie Duncan, Doris Landrum, Gloria Middleton, and Dimple Smith, all current HCVP voucher holders, filed a Plea in Intervention prior to removal and then a Motion to Intervene in this Court, seeking to intervene in support of the City. *See* Mot. Intervene [# 12]. The Court granted the motion on January 23, 2015. *See* Order of Jan. 23, 2015[# 18].

**\*4** The Association filed the instant "Emergency Motion for Temporary Restraining Order [TRO] and, Thereafter, Motion for Preliminary Injunction" [# 4] on January 5, 2015. Following hearing on the motion, the Court granted the TRO and held the motion for preliminary injunction in abeyance pending further development of the record and a second hearing. *See*

Order of Jan. 6, 2015[# 10]. During the second hearing, which took place on January 26, 2015, the Court heard testimony from witnesses, received exhibits, and entertained argument on the motion.

### Analysis

### I. Legal Standard

A party seeking a preliminary injunction must satisfy each of four criteria: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not granted, (3) the substantial injury outweighs the threatened harm to the party against whom the injunction is sought, and (4) granting the injunction will not disserve the public interest. *Planned Parenthood Ass'n of Hidalgo Cnty., Tex., Inc. v. Suehs,* 692 F.3d 343, 348 (5th Cir.2012)." '[A] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements.' " *Id.* (quoting *Tex. Med. Providers Performing Abortion Servs. v. Lakey,* 667 F.3d 570, 574 (5th Cir.2012)).

### II. Application

The Association argues the Ordinance is invalid for four reasons: first, it is preempted by state law; second, it is preempted by the federal Fair Housing Act; third, it unconstitutionally burdens the freedom to contract guaranteed by Article 1, § 16 of the Texas Constitution, which prohibits laws impairing the obligation of contracts; and fourth, it constitutes a regulatory taking and due process violation under both the Texas and United States Constitutions. The Association fails to demonstrate a substantial likelihood of success on the merits under any of its theories.

### A. State Preemption

The Association first argues the Ordinance is preempted by Texas law because it is not "substantially equivalent" to federal law, as required by § 214.903 of the Texas Local Government Code. Section 214.903 provides:

(a) The governing body of a municipality may adopt fair housing ordinances that provide fair housing rights, compliance duties, and remedies that

are substantially equivalent to those granted under federal law. Enforcement procedures and remedies in fair housing ordinances may vary from state or federal fair housing law.

(b) Fair housing ordinances that were in existence on January 1, 1991, and are more restrictive than federal fair housing law shall remain in effect.

TEX. LOCAL GOV'T CODE § 214.903. In the Association's view, § 214.903 preempts the Ordinance because the Ordinance "attempts to add a new protected class" that is different from those protected under the federal Fair Housing Act. Mot. Prelim. Inj. [# 4] at 6–7. The Court is unpersuaded.

**\*5** Home-rule cities, like the City of Austin, "have broad discretionary powers" to enact their own ordinances, "provided that no ordinance 'shall contain any provision inconsistent with the Constitution of the State, or [with] the general laws enacted by the Legislature of this State.' " Dall. Merch.'s & Concessionaire's Ass'n v. City of Dall., 852 S.W.2d 489, 490 (Tex.1993) (quoting TEX. CONST. art. XI, § 5). Home-rule cities "possess the full power of self-government and look to the Legislature not for grants of power, but only for limitations on their power." Id. at 490–91 (citing MJR's Fare v. City of Dall., 792 S.W.2d 569, 573 (Tex.App.-Dallas 1990, writ denied)). A home-rule city ordinance is unenforceable to the extent it conflicts with a state statute. Id. at 491 (citing City of Brookside Till v. Comeau, 633 S.W .2d 790, 796 (Tex.1982)). However, a state statute and a home-rule city ordinance " 'will not be held repugnant to each other if any other reasonable construction leaving both in effect can be reached.' " Id. (quoting City of Beaumont v. Fall, 291 S.W. 202, 206 (Tex.1927)). Consequently, if the Texas legislature decides to preempt a subject normally within a home-rule city's broad powers, " 'it must do so with unmistakable clarity.' " S. Crushed Concrete, LLC v. City of Hous., 398 S.W.3d676,678 (Tex.2013) (quoting In re Sanchez, 81 S.W.3d 794, 796 (Tex.2002)).

The Court finds the Association has failed to demonstrate a likelihood of success on the merits of its state preemption claim, as nothing in the record suggests § 214.903 preempts the Ordinance with "unmistakable clarity." The Association, without attempting to define "substantially equivalent," asserts

the Ordinance is not substantially equivalent to the federal Fair Housing Act simply because the federal Fair Housing Act does not include source of income as a protected class. The Association cites no authority in support of that bold proposition, however, and the Court declines to embrace it. Construing § 214.903 as the Association urges would mean the City has long been violating the statute, as the City's fair housing code protects a number of classes of persons not protected by the federal Fair Housing Act. "Substantially," moreover, is defined by the Oxford English Dictionary as "[i]n all essential characters or features[.]" [1] It seems to the Court the salient "essential features" of the federal Fair Housing Act are the classes of persons it protects. The Ordinance, in protecting from discrimination all of the classes protected under federal law and then some, exhibits the essential features of federal fair housing law. Cf. 24.C.F.R. § 115.204(h) (stating, in context of making substantial equivalency determination under federal law, if a local law "is different from the [Fair Housing] Act in a way that does not diminish coverage of the Act, including ... the protection of additional prohibited bases, then the ... local law may still be found substantially equivalent.").

**\*6** That being said, the Court notes it is unsure what to make of the City's argument on this point. The City claims "substantially equivalent" is a term of art in fair housing law, referring to HUD's federal statutory authority to "certify" a local (or state) PHA, which requires HUD to determine whether the local (or state) law the PHA administers is "substantially equivalent" to the federal Fair Housing Act. See 42 U.S.C. § 3610(f)(3) (explaining HUD may certify an agency if the fair housing law it administers is substantially equivalent to federal law). Austin's PHA is certified by HUD; the City therefore concludes "unless and until HUD revokes the City's substantial equivalency certification, there is no violation of [§ 214.903]." Def.'s Resp. Mot. Prelim. Inj. [# 8] at 6.

To the extent the City is claiming "substantially equivalent" as used in § 214.903(a) should be read coextensively with federal law, two unaddressed problems arise. First, that argument inserts the phrase "as determined by HUD" into § 214.903(a): "The governing body of a municipality may adopt fair housing ordinances ... that are substantially

equivalent[, *as determined by HUD,*] to those under federal law."Courts are generally not free to read into statutes language that is not there. *See, e.g., Lamie v. U.S. Trustee,* 540 U.S. 526, 538 (2004). Second, there appears to be a material difference between the federal and Texas statutes in employing the concept of substantial equivalency. Under federal law, HUD may certify a particular local agency only if (1) the rights the agency protects, (2) the procedures the agency follows, (3) the remedies available to the agency, and (4) the availability of judicial review of the agency's actions under the state or municipal fair housing law are all substantially equivalent to those created by and under the federal Fair Housing Act. 42 U.S.C. § 3610(f)(3)(A). Under § 214.903, however, "[e]nforcement procedures and remedies ... may vary from ... federal fair housing law."TEX. LOCAL GOV'T CODE § 214.903(a). It is not entirely clear to the Court whether or how the variance permitted by § 214.903 squares with the federal concept of substantial equivalency since, in order to certify a local agency, the federal statute requires the procedures followed by and remedies available to the local agency be substantially equivalent to federal fair housing law. Further, even if the Court accepted the City's argument § 214.903 could not be violated unless HUD revoked the City's substantially-equivalent status, the City conceded at hearing there was no evidence HUD had reviewed the Ordinance and made that determination.

The burden of demonstrating a substantial likelihood of success on the merits, however, belongs to the Association, not to the City. On the present record, the Court concludes the Association has not carried that burden on the question whether the Ordinance is preempted by § 214.903.

## B. Federal Preemption

**\*7** The Association next argues the Ordinance is preempted by the federal Fair Housing Act. Specifically, the Association claims because the Ordinance makes participation in HCVP mandatory under certain circumstances, it is preempted by the Act, which makes participation in HCVP voluntary. *See* 42 U.S.C. § 1437f(d)(1)(A) ("[T]he selection of tenants shall be the function of the owner."). The Court disagrees with the Association.

In determining whether federal law preempts state law, Congressional intent is the paramount consideration. *Cal. Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 280 (1987). Preemption may manifest in several different ways. First, Congress may expressly state a federal law preempts state law (express preemption).*Id.* Second, Congress's preemptive intent may be inferred where the federal scheme is so comprehensive it "occupies the field," leaving no room for supplementary state law (implied preemption).*Id.* at 280–81. Finally, and most relevant for present purposes, federal law may preempt state law to the extent the two actually conflict (conflict preemption), either because "compliance with both federal and state regulations is a physical impossibility," or because the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."*Id.* at 281 (internal quotes omitted).

The Association argues conflict preemption applies, and specifically that the Ordinance "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."*See* Pl.'s Trial Brief [# 11] at 3. According to the Association, "[t]he voluntary nature of the [Program] lies at the heart of the federal law," as evidenced by Congress's two previous experiments with "mandating property owner participation": the "take one, take all" provision, which prohibited a landlord from declining to rent to a voucher holder if the landlord had done so in the past, and the "endless lease" provision, which prohibited landlords from refusing to renew voucher holders' leases at the expiration of the initial lease term. *See id.; see also* Pub.L. No. 105–276, §§ 549, 554, 112 Stat. 2461 (1996) (repealing "take one, take all" and "endless lease" provisions). The Association notes both provisions were repealed "because of their chilling effect" on landlords' willingness to participate in the program, given its "burdensome requirements." *Id.* (citing S. Rep. NO. 104–195, at 31–32 (1995)).

To date, the Association's argument has been rejected by every court which has confronted it. *See Bourbeau v. Jonathan Woodner Co.,* 549 F.Supp.2d 78, 88–89 (D.D.C.2008) (finding prohibiting discrimination against voucher holders will "advance rather than denigrate" Congress's objectives); *Montgomery Cnty. v. Glenmont Hills Assocs. Privacy World,* 936 A.2d 325, 336 (Md.2007) ( "There is nothing in any

of the relevant Federal statutes even to indicate, much less establish, that voluntary participation by landlords was an important Congressional objective. The only declared objective is to assist State and local governments in expanding affordable housing for low-income families...."); *Franklin Tower One, L.L.C. v. N.M.,* 725 A.2d 1104, 1113 (N.J.1999) ("[T]he voluntary nature of the Section 8 program is not at the heart of the federal scheme."); *Comm'n on Human Rights & Opportunities v. Sullivan Assocs.,* 739 A.2d 238, 246 (Conn.1999) ("Requiring landlords to extend rental opportunities to otherwise eligible section 8 recipients ... is not an obstacle to the congressional agenda but serves instead to advance its remedial purpose."); *Attorney General v. Brown,* 511 N.E.2d 1103, 1106 (Mass.1987) (reasoning helping low-income families obtain decent housing, not voluntary landlord participation, is at the heart of the federal scheme).

**\*8** The Court can see no reason to swim against the current. The undersigned is of the opinion Congress's decision to repeal the "take one, take all" and "endless lease" provisions provides no support for a conflict preemption argument. The provisions in question were repealed in order to encourage landlords to participate in the voucher program such that more housing would be available to voucher holders, not to protect landlords from being required to rent to voucher holders. [2] *See Franklin Tower One,* 725 A.2d at 1113 (concluding repeal of "take one, take all" supports conclusion Congress's goal "has always been to assist in providing housing to low-income families"). Further, the Court agrees with the City and the decisions cited above that the purposes and objectives of HCVP are "to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families," not to protect landlords' rights. 42 U.S.C. § 1437(a)(1)(A) (declaring Congressional policy). The Ordinance clearly serves those purposes and objectives by increasing the number of houses and apartments available to voucher holders, and in doing so, "advance[s] rather than denigrate[s]" the Program's objectives. *Bourbeau,* 549 F.Supp.2d at 88 (citing *Glenmont Hills,* 936 A.2d at 336).

In support of its contrary position, the Association cites *Salute v. Stratford Greens Garden Apartments,* 136 F.3d 293 (2d Cir.1998), *and Knapp v. Eagle Property*

*Management Corp.,* 54 F.3d 1272 (2d Cir.1995). Neither case directly addresses federal preemption. The question before the *Salute* court was whether the provision of the Fair Housing Act that requires landlords to make "reasonable accommodations" for disabled tenants required landlords to accept disabled tenants' housing vouchers. *Salute,* 136 F.3d at 301. In holding it did not, the *Salute* court did discuss the "burdensome requirements" of the voucher program, but the underpinning of its decision was that the disabled plaintiffs, in asking the landlords to accommodate them by accepting their vouchers, sought "to remedy economic discrimination of a kind that is practiced without regard to handicap." *Id.* at 302. Consequently, the *Salute* panel reasoned, it was not necessary to require landlords to accept disabled persons' housing vouchers "to afford handicapped persons equal opportunity to use and enjoy a dwelling." *Id.* (internal quotes omitted).

Similarly, the *Knapp* court did not confront a preemption question. The issue before the panel was whether a Wisconsin statute that prevented discrimination in housing based upon "lawful source of income" encompassed housing vouchers. *Knapp,* 54 F.3d at 1282. In holding housing vouchers were outside the statute's purview, the court noted the contrary result would mean any landlord who did not accept vouchers could be liable for discrimination, and observed: "It seems questionable ... to allow a state to make a voluntary federal program mandatory."*Id.* Even in so observing, however, the *Knapp* court included a qualifying citation to *Attorney General v. Brown,* which found the Fair Housing Act did not preempt a state source-of-income statute-the only reported decision discussing the question as of 1995, the year *Knapp* was decided. *Id.* (citing 511 N.E.2d at 1106). The Court finds the decisions from those courts directly presented with the federal preemption question far more persuasive than dicta from those which were not.

**\*9** Finally, the Court notes the HUD regulations implementing HCVP specifically provide the federal statutes creating it are not intended "to pre-empt operation of State and local laws that prohibit discrimination against a Section 8 voucher-holder because of status as a Section 8 voucher-holder."24 C.F.R. § 982.53(d). The Court owes deference to

HUD's interpretation of the laws it administers. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer[.]").

Given all of the above, the Court concludes the Association has failed to show a substantial likelihood of success on the merits of its federal preemption claim.

## C. Texas Constitution
The Association next argues the Ordinance violates Article I, § 16 of the Texas Constitution, which prohibits any law impairing the obligation of contracts. The Association contends an individual may not be forced to contract against his will under Article I, § 16; thus, in the Association's view, by prohibiting landlords from rejecting applicants because they wish to pay with housing vouchers, the Ordinance unconstitutionally forces unwilling landlords to sign the HAP Contract. *See* Mot. Prelim. Inj. [# 4] at 8; Pl.'s Trial Brief [# 11] at 4–5.

The Association misapprehends the nature of the constitutional protection. Article I, § 16 applies "only where parties have entered into a contract and *thereafter* a statute is passed that unlawfully impairs their contractual obligations." *Cessna Fin. Corp. v. Morrison,* 667 S.W.2d 580, 584 (Tex.App.-Houston [1st Dist.] 1984, no writ); *see also Travelers' Ins. Co. v. Marshall,* 76 S.W.2d 1007, 1011 (Tex.1934) ("[S]ection 16 of article 1 of the constitution of Texas.... protects all obligations of contracts from destruction or impairment by *subsequent* legislation.") (emphasis added); *Hen derson v. Love,* 181 S.W.3d 810, 814 (Tex.App.-Texarkana 2005, no pet.)("The 'obligation of a contract,' for purposes of the constitutional prohibition of impairment of contractual obligations, is defined as the law which binds the parties to perform their agreement. The laws in effect *at the time a contract is executed* are considered part of that contract.") (emphasis added) (internal citations omitted); *City of Brownsville v. Pub. Util. Comm'n of Tex.,* 616 S.W.2d 402, 410 (Tex.App.-Texarkana 1981, writ ref'd n.r.e.) ("The obligations of a contract are not impaired ... by a statute in effect when the contract was made."); *Barton v. Wichita River Oil*

*Co.,* 187 S.W. 1043, –45 (Tex.App.-Fort Worth 1916, writ ref'd) ("The provision of the Constitution which declares that no state shall pass any law impairing the obligation of contracts does not apply to a law enacted prior to the making of the contract ... but only to a statute of a state enacted after the making of the contract."). Because the Association has not alleged the obligations of any existing contract are impaired by the Ordinance, Article I, § 16 does not apply.

**\*10** Urging a different conclusion, the Association cites to *St. Louis Southwestern Railway Co. of Texas v. Griffin,* 171 S.W. 703 (Tex.1914).*Griffin* provides no support for the Association's argument. In *Griffin,* a railway worker (Griffin) sued his employer under what was then known as the "Blacklisting Law." *Id* . at 703. The Blacklisting Law required an employer, after firing an employee, give the employee a "true statement" explaining the reasons for his termination. *Id.* Considering the constitutionality of the Blacklisting Law, the court noted when Griffin entered the railway's employ, Griffin had the right to leave his job without cause or notice, and the railway had the right to fire Griffin without cause or notice. *Id.* at 704. The court then observed the Blacklisting Law, by requiring the railway give Griffin a statement of the "true cause" of his termination, denied the railway its right to fire Griffin without cause, because a requirement the employer give a "true cause" for firing an employee necessarily implies a "true cause" exists. *Id.* The court concluded:

> The value of the contract to each party consisted largely in the mutual right to dissolve the relation of master and servant at will. The destruction of that right in the corporation was a violation of its liberty of contract and a denial of the equal protection of the law[ ] in violation of ... the fourteenth amendment.

*Id.* The court was concerned with the effect of the law on the railway's contractual right to terminate Griffin without cause. The question before the *Griffin* court thus had nothing to do with whether a law should be held unconstitutional because it "compelled the

entering of contracts," as the Association claims. Pl.'s Trial Brief [# 11] at 5.

Article I, § 16 of the Texas Constitution does not apply on these facts. The Association has therefore failed to demonstrate a substantial likelihood of success on the merits of its obligation-of-contracts claim.

### D. "Liberty of Contract"

In making its obligation-of-contracts argument, the Association heavily relies on dicta from the *Griffin* court: "The liberty to make contracts includes the corresponding right to refuse to accept a contract[.]"*Griffin,* 171 S.W. at 704. An argument the Ordinance is unconstitutional because it will require property owners to sign a contract, however, sounds in substantive due process, not in impairment of the obligation of contracts. *See, e .g., Andrada v. City of San Antonio,* 555 S.W.2d 488, 491 (Tex.App.-San Antonio 1977, writ dism'd) ("[L]iberty of contract is generally said to be a part of that 'liberty' which is protected by due process clauses."). The Court thus considers the argument under a due process rubric.

The Association's reluctance to locate its claim in due process is unsurprising, since in the federal context "[t]he traditional view ... is that the [Supreme] Court exceeded its legitimate judicial role by reading the right of 'liberty of contract' into the Fourteenth Amendment's Due Process Clause, despite the absence of textual support for this right."David E. Bernstein, *Lochner's Legacy's Legacy,* 82 Tex .L.Rev. 1, 3– 4 (2003). Since the era of *Lochner v. New York*[3] drew to a close in the late 1930s, the Supreme Court has reviewed economic legislation affecting liberty of contract with great deference to the legislature. *See, e.g., Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1,15 (1976) ("It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."); *Ferguson v. Skrupa,* 372 U.S. 726, 730 (1963) ("We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws."); *see also*

*Chi. B. & Q.R. Co. v. McGuire,* 219 U.S. 549, 567 (1911) ("The Constitution does not speak of freedom of contract.... There is no absolute freedom to do as one wills or to contract as one chooses.").

**\*11** A federal "liberty of contract" substantive due process claim is thus a veritable non-starter, and in any event, the Association has made no allegation the City acted in an arbitrary or irrational way by passing the Ordinance. Moreover, the Ordinance advances an obviously legitimate government interest: ensuring low-income persons—many of whom are racial minorities, children, disabled, or elderly—have access to affordable housing (and thus to better schools and safer neighborhoods) throughout the City of Austin. *See* Prelim. Inj. Mot. Hrg. Ex. D–1 (City Council Resolution) at 2–3 (noting 91% of rental units in Travis County do not accept vouchers and high occupancy rates exacerbate the difficulties voucher holders face in finding housing); *id.*Ex. D–4 (Demographics Rep.) (indicating among heads-of-household who hold vouchers in Austin, 43% are disabled, 84% are female, and 16% are elderly, and stating 50.8% of HCVP beneficiaries are children); *see also Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n,* 110 F.3d 318, 333 (6th Cir.1997) ("[F]reedom of contract entails the freedom not to contract, *...except as restricted by* antitrust, *antidiscrimination,* and other statutes."(emphasis added)).

A Texas liberty-of-contract due process claim might present a slightly different question. Texas courts have been inconsistent in describing the scope of substantive due process under the Texas Constitution as compared to the federal Constitution, sometimes stating the Texas Constitution provides "an identical guarantee" and sometimes "attempt[ing] to articulate [Texas'] own independent due [process] standard, which some courts have characterized as more rigorous than the federal standard." *Tex. Workers' Comp. Comm'n v.. Garcia,* 893 S.W.2d 504, 525 (Tex.1995). The "more rigorous" standard cited is a 1957 formulation:

> The line where the police power of the state encounters the barrier of substantive due process is not susceptible of exact definition. As a general rule the power is commensurate

with, but does not exceed, the duty to provide for the real needs of the people in their health, safety, comfort and convenience as consistently as may be with private property rights.... A large discretion is necessarily vested in the Legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests. If there is room for a fair difference of opinion as to the necessity and reasonableness of a legislative enactment on a subject which lies within the domain of the police power, the courts will not hold it void.

*State v. Richards,* 301 S.W.2d 597, 602 (1957) (emphasis added). One Texas court, in dicta, agreed "in general" with the proposition that Article I, § 19 "guarantees broader due process protection for substantive economic rights than does the United States Constitution." *Yorko v. State,* 681 S.W.2d 633, 636 (Tex.App.-Houston [14th Dist.] 1984), *aff'd,* 690 S.W.2d 260 (Tex.Crim . App.1985). "More frequently, however," Texas courts have "relied on both state and federal authorities in discussing" Article I, § 19, and a "substantial number of Texas cases" have held or implied that the federal and Texas clauses are "identical," in contrast with only a "handful" of opinions suggesting the Texas clause has independent meaning. *Lucas v. United States,* 757 S.W.2d 687, 712–13 (Tex.1988) (collecting cases).

**\*12** Whichever standard is applied, however, the Court finds the Association has failed to demonstrate a substantial likelihood of success on the merits. There is, at the very least, "room for a fair difference of opinion" as to the necessity and reasonableness of the Ordinance in providing for "the real needs of the people ... as consistently as may be with private property rights." The record shows HCVP participants suffer serious discrimination in the Austin private housing market and, to the extent they are able to find housing, are concentrated in the poorest areas of the city. *See City Council Resolution* at 3 (stating

91% of Austin landlords do not accept vouchers); Prelim. Inj. Hrg. Ex. D–3 (indicating concentration of voucher holders by zip code); *id.*Ex. D–5 (explaining the units in Austin available to voucher holders "are located in low-opportunity areas and lack high-performing schools, sustainable employment, and low-crime neighborhoods"). The City determined the public interest required discrimination against voucher holders be prohibited, as have dozens of states and municipalities around the nation. *See*POVERTY & RACE RESEARCH ACTION COUNCIL, APPENDIX B: STATE, LOCAL, & FEDERAL LAWS BARRING SOURCE–OF–INCOME DISCRIMINATION 1–2 (2014) (listing state and local source-of-income laws)[4] ; *see also, e.g., Godinez v. Sullivan–Lackey,* 815 N.E.2d 822, 824 (Ill.App.Ct.2004) (finding refusal to rent to voucher holder a violation of source-of-income anti-discrimination provision in Chicago's Fair Housing Ordinance); *Glenmont Hills,* 936 A.2d at 327 (same, as to Montgomery County, Maryland housing ordinance); *Timkovsky v. 56 Bennett, LLC,* 881 N.Y.S.2d 823, 829 (N.Y.App.Div.2009) (same, as to New York City housing ordinance).

The counterargument, of course, is that the Ordinance goes too far in attempting to accomplish its goal, since at least some landlords who do not wish to do so will be required to sign the HAP Contract and subject themselves to the regulations governing the Program. Orig. Pet. ¶ 31. While the parties dispute the precise extent of the differences between the terms of a tenancy governed solely by the Association's standard lease and one governed by the standard lease plus the HAP Contract and Tenancy Addendum, it is clear the latter requires a landlord to shoulder different burdens and accept different risks than the former. As previously explained, the PHA's responsibility for making rent payments terminates automatically under certain circumstances; the PHA has discretion to stop making payments under certain circumstances; the PHA is only obligated to pay late fees for tardy payments under certain circumstances; units rented to Program participants must be inspected, and the PHA will not begin paying rent on a unit until it passes inspection; and the landlord will not receive the entirety of the first month's rent until thirty to forty-five days after the unit passes inspection.[5]

**\*13** The Court agrees these regulations place some burden on the landlords subject to them, and acknowledges the potential for lost revenue while a PHA inspection is scheduled and a unit sits vacant. It is likely there are different, less burdensome ways the City could entice property owners to participate in the Program. It is also conceivable an individual landlord could experience an unusually significant financial burden flowing from participation in the Program so great it could support an as-applied constitutional claim warranting an exception from participation. [6] In the context of a facial due process challenge, however, this Court cannot say there is no room for a "fair difference of opinion" regarding the need for the Ordinance and the weight of the burdens it imposes, and will not substitute its judgment for the City Council's.

Further, courts that have considered versions of the so-called administrative-burdens defense have rejected it. *See Bourbeau,* 549 F.Supp.2d. at 87; *Glenmont Hills,* 936 A.2d at 339–40. Landlords remain free to reject voucher holders provided they do so on other legitimate, nondiscriminatory grounds, and are not required to reduce the rent they charge even if that means their units are too expensive for voucher holders to rent. Further, testimony at hearing indicated the housing quality standards a unit must satisfy to pass the PHA inspection are no more onerous than those already imposed by the Austin City Code. These burdens are not so severe as to constitute a violation of due process.

The Court concludes, to the extent the Association raised a "liberty of contract" due process claim, it has failed to demonstrate a substantial likelihood of success on the merits.

**E. Regulatory Taking**

Finally, the Association rather weakly asserts the Ordinance is so burdensome it amounts to a regulatory taking under the Texas and United States Constitutions and a violation of substantive due process. *See* U.S. Const. amends. V, XIV; Tex. Const. art. I, § 17(a). Where a plaintiff alleges a takings claim and a substantive due process claim together, courts must determine the extent to which the due process claim "rests on protections that are also afforded by the Takings Clause" and analyze the claim accordingly. *John Corp. v. City of Hous.,* 214 F.3d 573, 583 (5th Cir.2000). Here, the Court finds, to the extent it is unaddressed by the Court's discussion in section II(D), *supra,* the Association's due process claim is subsumed within its takings claim. The petition contains very few allegations concerning due process, merely asserting the right to be free from a "substantial burden" that "deprives property owners of use of their property," *see* Orig. Pet. [# 1–3] ¶¶ 30–31; further, the Association fails to develop a due process theory in its briefing, *see* Pl.'s Trial Brief [# 11] at 6–7. The right to be free from a "burden" that "deprives property owners of use of their property" falls squarely within the ambit of the Takings Clause. *See Yee v. City of Escondido, Cal.,* 503 U.S. 519, 522–23 (1992) (explaining the Takings Clause requires compensation where "the extent to which [the regulation] deprives the owner of the economic use of the property suggest[s] that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole"). It is therefore the Takings Clause, "not the more generalized notion of 'substantive due process,' [that] must be the guide for analyzing" the Association's claim. *John Corp.,* 214 F .3d at 582.

**\*14** On to the analysis. The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment, directs that private property shall not "be taken for public use, without just compensation." U.S. CONST., amend. V; *Chi., B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 234 (1897). The Texas Constitution contains a similar mandate: "[n]o person's property shall be taken ... for or applied to public use without adequate compensation being made." TEX. CONST. art. I, § 17. Federal and Texas courts apply the same standards in evaluating takings claims. *Hearts Bluff Game Ranch, Inc. v. State,* 381 S.W.3d 468, 477 (Tex.2012) ("We consider the federal and state takings claims together, as the analysis for both is complementary.").

Before addressing the merits of a takings claim, the Court must be convinced the claim is ripe, even if neither party has raised the issue. *Urban Developers, L.L.C v. City of Jackson, Miss.,* 468 F.3d 281, 292 (5th Cir.2006). Here, the Interveners raise the ripeness issue, arguing adjudication of the takings issue is premature and speculative because the Ordinance, on

its face, does not require landlords to reduce the rents or security deposits they typically charge. While the Intervenors fail to further elaborate, their ripeness objection appears to be that because the Ordinance has yet to take effect, we cannot know whether any landlord will actually lose money due to operation of the Ordinance.

The Intervenors approach the problem incorrectly. To the extent the Intervenors are pointing out the Association's challenge presents no concrete controversy concerning application of the Ordinance to *specific landlords,* the Court agrees. The Association *has* raised, however, a pre-enforcement facial challenge to the constitutionality of the Ordinance itself. Thus, " 'the only question before this court is whether the mere enactment of [the Ordinance] constitutes a taking,' " and the applicable test is whether the Ordinance " 'denies an owner economically viable use of his land.' " *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 493 (1987) (some internal quotes omitted) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 295–96 (1981)). [7]

The Association argues the Ordinance does just that, but the Court is unpersuaded. Landlords remain free to rent their property to paying tenants. No landlord is required to lower the rent he or she charges for a unit because a voucher holder cannot afford to rent it. Property owners who accept HCVP tenants receive compensation for doing so in the

form of rent payments from the government. Further, the Ordinance substantially advances an obviously legitimate government interest: ensuring low-income persons will have access to affordable housing throughout the City of Austin. *See Dolan v. City of Tigard,* 512 U.S. 374, 385 (1994) ("A land use regulation does not effect a taking if it substantially advances legitimate state interests and does not deny an owner economically viable use of his land."(internal quotes omitted)); *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 933–34 (Tex.1998) (discussing substantial-advancement requirement).

 **\*15** The Court concludes the Association has failed to carry its burden to show a substantial likelihood of success on the merits of its takings claim.

## Conclusion

The Association has failed to demonstrate a substantial likelihood of success on the merits on any of its challenges to the Ordinance. The Court therefore need not consider the other preliminary injunction factors before denying the motion for injunctive relief.

Accordingly,

IT IS ORDERED that Plaintiff Austin Apartment Association's Motion for Preliminary Injunction [# 4] is DENIED.

### Footnotes

1    *Substantially, adv.,* OED ONLINE, http:// www.oed.com/view/Entry/193055 ? redirectedFrom=substantially & .

2    The Court further notes the inference HCVP is voluntary comes from solely from the previously quoted subsection of the statute which states "[c]ontracts to make assistance payments entered into by a[PHA] with a [landlord] shall provide that ... the selection of tenants shall be the function of the owner[.]"42 U.S.C. § 1437f(d)(1)(A). Nothing in that provision implies a landlord should have the right to discriminate against a voucher holder simply because he or she is a voucher holder. *Franklin Tower One,* 725 A.2d at 1113.

3    198 U.S. 45 (1905).

4    *Available at* http://www.prrac.org/pdf7AppendixB-Feb2010.pdf.

5    *See* Background, subsection A, *supra.*

6    *Cf.* Krista Sterken, *A Different Type of Housing Crisis: Allocating Costs Fairly and Encouraging Landlord Participation in Section 8,* 43 COLUM. J.L. & SOC. PROBS. 215, 227–30 (2009) (advocating for a "narrow" equitable exception to landlord participation applicable under "unusual circumstances").

7    The Intervenors cite *Pennell v. City of San Jose,* 485 U.S. 1 (1988), in support of their contrary position. *Pennell* is distinguishable. *Pennell* involved a rent-control ordinance requiring city officers to consider "hardship to the tenant" in deciding whether to approve certain rent increases. *Id.* at 10. Importantly, the ordinance also provided that in making

the ultimate decision to approve or disapprove a rent increase, the officer "may" disapprove an increase because of tenant hardship. *Id.* Because there remained a material question, given the discretion afforded city officers, as to how the ordinance would ultimately be applied, the *Pennell* court found the case did not present a sufficiently concrete factual setting for adjudication of the takings claim. *Id.* Here, the Ordinance involves no such discretion: the City has not contested the fact it intends to apply the Ordinance such that all landlords subject to its strictures are prohibited from discriminating against voucher holders solely because they are voucher holders. ' "One does not have to await the consummation of threatened injury to obtain preventive relief." ' *Blanchette v. Conn. Gen. Ins. Corps.,* 419 U.S. 102, 143 (1974) (quoting *Pennsylvania v. West Virginia,* 262 U.S. 553, 593 (1923)).

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# <u>APPENDIX</u>

2.  Comparison of Texas Apartment Association lease and Section 8 Housing Voucher Program Requirements

**<u>Comparison of Texas Apartment Association lease and Section 8 Housing Voucher Program Requirements</u>**

---

**(from Association's Emergency Motion, at p. 6)**

**1.  Pre–approval from Housing Authority:**

Under a TAA Lease, the resident and property owner can determine the terms of the lease, including the amount of rent and length of the lease.  *See* Emergency Motion, at Exhibit C (TAA Lease).

*But:*

After reaching agreement with a prospective housing voucher resident on all material terms of the lease, a property owner must submit a Request for Tenancy Packet to the Housing Authority. Housing Authority "Steps to Participate in Program" (Ex.2), § 4.

The Housing Authority "must approve all rents requested." Steps to Participate in Program § 6; Housing Assistance Payments Contract ("HAP Contract") (Ex. 3), p. 5, § 6.

"The initial lease term must be for one year" unless the Housing Authority approves an exception.  HAP Contract, p. 1, § 5.

---

**<u>Reply:</u>** A public housing authority may approve a shorter initial lease term if it determines that such shorter term would improve housing opportunities for the tenant, and such a shorter term is the prevailing local market practice.  24 C.F.R. § 982.309(a)(2) (2014).

Also, nothing in the ordinance requires that a landlord use a one-year lease term if the landlord's standard practice is a nine-month or six-month lease term. If a landlord insists on using a six-month lease term, the housing authority must either accept the shorter term or inform the voucher holder that the unit is not acceptable.

A landlord may charge **whatever rent** the landlord believes the market will bear.  The public housing authority may not approve a unit unless the rent amount rent is reasonable.  24 C.F.R. § 982.305(a)(4) (2014).  **However, nothing in Section 8 Program or the City's ordinance requires a landlord to reduce rents to lease to a person with a Section 8 voucher.**

---

**(from Association's Emergency Motion, at p. 6)**

**2.  Delay for government inspection and contract processing**:

Under a TAA Lease, a potential resident can inspect a unit at the time of the lease application, and then the resident rents the unit "as is."  The resident can move in immediately. TAA Lease, §§ 16, 25.

*But:*

A housing voucher resident cannot move in (and no rent will be paid) until after the Housing Authority schedules an inspection and approves the unit." Steps to Participate in Program, § 6; HAP Contract, p. 4, § 3.   . . .

---

**Reply:**  It is true that the Housing Authority will not begin paying rent until the unit has passed inspection.  *See* 24 C.F.R. § 982.305(b), (c) (2014).  But nothing in the City's ordinance requires a landlord to hold a unit if a market tenant can move in immediately and begin paying rent while the voucher tenant cannot.  Nothing in the regulations precludes the voucher tenant from signing a lease and paying market rent until such time that the unit passes inspection.

With respect to the assertion that under the TAA lease a potential resident rents the unit "as is," under state law "there is an implied warranty of habitability by the landlord that the apartment is habitable and fit for living.  This means that at the inception of the rental lease there are no latent defects in the facilities that are vital to the use of the premises for residential purposes and that these essential facilities will remain in a condition which makes the property livable." *Kamarath v. Bennett*, 568 S.W.2d 658, 661 (Tex. 1978); *see also* Tex. Prop. Code Ann. § 92.052 (2014) (Landlord's Duty to Repair or Remedy).

**(from Association's Emergency Motion, at p. 6-7)**

**3. Mandated government contract and rental lease terms**:

Under a TAA Lease, the property owner has no obligation to contract with any government agency or incorporate its mandated lease terms.  TAA Lease.

*But:*

The HAP Contract is a 12-page HUD form contract between the Housing Authority and the property owner.  HAP Contract.

The HAP Contract mandates that while the property owner and resident can use the standard TAA Lease, the lease must also 'include word-for-word all provisions of the tenancy addendum required by HUD.' HAP Contract, p. 4, § 2.

The HUD tenancy addendum provides that if there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.'  HAP Contract, p. 9, § 2(b).

**Reply**: The "12-page" form contract includes the tenancy addendum. TAA uses a six-page form lease tenants are required to sign and that has twenty-five possible lease addenda that a landlord may require the tenant sign.  *See* TAA Lease, ¶ 43.  (Interestingly, the TAA lease text appears to be in the equivalent of about a 6.5 point *Times New Roman* font size as compared to 9.0 point *Times New Roman* font size for the housing assistance payments contract.)

> **(from Association's Emergency Motion, at p. 7)**
>
> **4.  Delay in receipt of rent**:
>
> Under a TAA Lease, rent is due in advance (the first month's rent is due when the lease begins).  TAA Lease, § 14.
>
> *But*:
>
> Under the housing voucher program, the first month's rent is not paid in advance.

**Reply:** It is true that as a matter of practice the landlord will experience some delay in receiving the first month's housing assistance payment from the Housing Authority.  But the housing assistance payments contract "shall provide for penalties against the PHA for late payment of housing assistance payments" if such penalties are in accordance with local housing practices, it is the owner's practice to charge such penalties to all tenants, and the owner also charges the tenant late charges for late payment. 24 C.F.R. § 982.451(b)(5)(ii)(A)  (2014).

The tenant's rent payments must be paid in accordance with the terms of the lease.  *See generally* 24 C.F.R. § 982.308 (2014) (Lease and tenancy).

> **(from Association's Emergency Motion, at p. 7)**
>
> **5.  No timely rent obligation**:
>
> Under a TAA Lease, it is a lease violation if rent is not paid when due.  TAA Lease, §32.
>
> *But:*
>
> The HUD tenancy addendum provides that the Housing Authority's failure to timely pay housing assistance payments is not a violation of the lease. HAP Contract, p. 9, § 5(d).

**Reply:** The tenant must pay rent on time or can be evicted.  *See* 24 C.F.R. § 982.310(a)(1) (2014) (owner may terminate the tenancy for failing to pay rent

or other amounts due under the lease.).

---

**(from Association's Emergency Motion, at p. 7-8)**

**6.  No late fee responsibility absent HUD approval**:

Under a TAA Lease, if any rent is not paid on time, late charges will be assessed. TAA Lease, § 6.

*But:*

Under the housing voucher program, HUD determines whether the Housing Authority will pay any late charges. HAP Contract, p. 5, § 7(a)(3).

---

**Reply:** Just as under the TAA lease, the voucher tenant must pay rent in accordance with the terms of the lease. *See generally* 24 C.F.R. § 982.308 (2014) (Lease and tenancy).  The voucher tenant's share of the rent is due on the date stated in the lease. *See id.*  Since the owner may use its standard lease, the tenant may be charged a late charge for failing to pay on time. *See id.*; § 982.451(b)(5)(ii)(A)(*3*).

The housing assistance payments contract between the local housing authority and the landlord is effective the date of the lease.  *See id.* § 982.451(a)(2). The housing assistance payments contract "shall provide for penalties against the PHA for late payment of housing assistance payments" if such penalties are in accordance with local housing practices, it is the owner's practice to charge such penalties to all tenants, and the owner also charges the tenant late charges for late payment. *Id.* at § 982.451(b)(5)(ii)(A).

---

**(from Association's Emergency Motion, at p. 8)**

**7. Housing Authority's and resident's release from rent obligations**:

The TAA Lease does not terminate at the end of the lease term unless the resident has given the property owner advance written notice of his intent to move out; if no notice is given, the lease renews on a month-to-month basis.  TAA Lease, §§ 3, 37.  A resident cannot move out during the term of the lease and, if he does so, he remains responsible for all remaining unpaid rent.  TAA Lease, § 32.

*But:*

Under the housing voucher program, the Housing Authority will terminate rental payments whenever a resident moves out, even if the resident moves out during the lease term (in violation of the lease).  HAP Contract, p. 5, § 7(a)(4).

---

**Reply:**    The Housing Authority will terminate housing assistance payments when the tenant moves.  However, like tenants who do not have a voucher, Section 8 voucher tenants cannot simply move out during the term of the lease.  *See* 24 C.F.R. § 982.314(b) (2014) (When family may move).  And, if they do, they can suffer the same penalties associated with early termination of the lease, including reletting fees and breach of lease penalties, so long as they have signed the same TAA lease as the market tenant.

More seriously, if a voucher tenant moves in violation of the terms of the lease, that would constitute a serious lease violation for which the tenant may be terminated from the voucher program  *See* 24 C.F.R. §§ 982.551(e) (2014) (family may not commit any serious or repeated violation of the lease); 928.314(b)(1) (2014) (when family may move); 982.552(c)(1)(i) (2014) (family may be terminated from the program for violation of any family obligations).

**(from Association's Emergency Motion, at p. 8)**

**8.  Housing Authority's ability to unilaterally terminate lease**:

Under a TAA Lease, a resident must pay the rent obligations throughout the term of the lease.  The resident remains liable for all rent even if he moves out early.  TAA Lease, § 22.

*But:*

Under the housing voucher program, the HAP Contract terminates if the resident moves out or if the Housing Authority terminates assistance to the family, determines the unit is not large enough due to changes in the family's circumstances, or determines its "available program funding is not sufficient."  HAP Contract, pp. 4-5, § 5.

"[I]f the HAP Contract terminates for any reason, the lease terminates automatically," releasing the resident of any further rental obligation.  HAP Contract, p. 11, § 9.

**Reply:**  Section 8 voucher tenants are subject to contractual penalties in the TAA lease associated with early termination.  In addition, if a voucher tenant moves early in violation of the terms of the lease (or fails to pay rent or comply with other terms of the lease), the Housing Authority may terminate the tenant's voucher assistance.  *See* 24 C.F.R. §§ 982.551(e) (2014) (family may not commit any serious or repeated violation of the lease); 928.314(b)(1) (2014) (when family may move); 982.552(c)(1)(i) (2014) (family may be terminated from the program for violation of any family obligations).  Thus, the family has strong incentives to pay the rent and follow the lease, including not moving out early, in order to avoid removal from the voucher program.